UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| *versus* | : | CRIMINAL NO. 97-5-SDD |
| | : | |
| BILLY DOUGLAS | : | |

**UNITED STATES' RESPONSE IN OPPOSITION
TO DEFENDANT'S AMENDED MOTION FOR
<u>COMPASSIONATE RELEASE</u>**

Defendant Billy Douglas has filed an amendment to his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Doc. 182. The original motion was denied for failure to exhaust administrative remedies and failure to establish extraordinary and compelling reasons for a sentence reduction. Doc. 181. Because the amended motion does not correct the flaws in the original motion, because defendant would pose a danger if released, and because the sentencing factors under 18 U.S.C. § 3553 weigh against release, the amended motion should be denied.

**I.   <u>Background</u>**

Defendant is serving a life sentence at the Federal Correctional Institution at Petersburg, Virginia, a medium security prison, following his conviction of interstate domestic violence. See BOP Inmate Locator.[1] To date, there have been no cases of inmate COVID-19 infection at FCI Petersburg (Medium). See BOP's

---

[1] The Inmate Locator can be found on BOP's website at https://www.bop.gov/inmateloc/ (last visited on May 27, 2020).

COVID-19 Resource Page located at https://www.bop.gov/coronavirus/ (last visited May 27, 2020).

On May 4, 2020, defendant filed a motion to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Doc. 180. He alleged that "his age (53), COVID-19, and his post-conviction rehabilitation" constitute "extraordinary and compelling" reasons to reduce his sentence. Id. at 1. He acknowledged that he had not exhausted his administrative remedies. Id. at 2.

The Court denied the motion on May 11, 2020, "[b]ecause Douglas admi[tted] he has failed to exhaust administrative remedies, and because he present[ed] no evidence of extraordinary and compelling reasons for his release." Doc. 181 at 1. The Court also noted that defendant "present[ed] no meaningful argument or evidence regarding the 3553(a) factors" that would warrant exercise of the Court's discretion to reduce his sentence even if he were eligible for a reduction. Id. at 4.

On the same day that the Court ruled on the motion, defendant filed a purported amendment to the motion consisting of numerous supporting documents. Doc. 182. For the most part, the documents relate to his performance in prison. Id. The documents also include a few pages of medical records evidencing minor health problems unrelated to vulnerability to COVID-19. Id. at Ex. D. Finally, the documents include a 1999 affidavit by his trial counsel detailing alleged inadequacies of his representation. Id. at Ex. H.

## II.     Facts[2]

Defendant and Laura Faulkner were married in September 1990. As Faulkner testified at trial, prior to and during their marriage, she was physically, mentally, and sexually abused by defendant. Defendant repeatedly threatened Faulkner, beat her, and forced her to engage in sexual activity. On several of the occasions when Faulkner managed to leave defendant, he tracked her down and abducted her. Once, he kidnapped her at gunpoint from her place of employment in El Paso, handcuffed her legs, beat her, and said he was taking her to the desert to kill her; fortunately, she was rescued after witnesses called the police.

In September 1996, Faulkner filed suit to divorce defendant. She left their home in Alabaster, Alabama, and moved to Louisiana with their child, Nicolette Douglas, who was then two years old.

On November 21, 1996, defendant and an acquaintance, Jeff Breckinridge, drove to Gonzales, where Faulkner was living with family. They got a motel room and then drove to Kenner where they rented a car. The next morning, defendant purchased a pair of brown cloth work gloves. Later, he and Breckinridge drove the rental car to Faulkner's mother's home. When Faulkner went to her mother's house to pick up her laundry, defendant, who had been hiding behind the home, attacked her. Defendant instructed Breckinridge to take Faulkner's purse, hide the keys to her car, and watch Nicolette and Faulkner's three-year-old niece, who were waiting

---

[2] The facts are taken from the United States' memorandum in opposition to defendant's first motion to vacate under 28 U.S.C. § 2255. See Doc. 86. Additional details, particularly regarding defendant's history of domestic violence, can be found in the memorandum.

3

in Faulkner's car.

Defendant then forced Faulkner inside the home and demanded that she take off her clothes. When she refused, he slapped her, forcibly removed her clothing, pushed her onto her mother's bed, and raped her. Defendant then held Faulkner upside down and told her that he wanted to make her pregnant so that she would come back to him.

Afterwards, defendant put on the pair of gloves he had purchased the previous day and pulled the naked Faulkner around the home as he searched for items. He also demanded that Faulkner take off her jewelry. When she asked why, he punched her in the eye. Thereafter, Faulkner gave her jewelry to defendant. Defendant then went outside and instructed Breckinridge to cut the phone lines. While defendant was outside, Faulkner dialed 911 on her mother's cordless phone and threw the phone under the table.

When defendant came back in, he forced Faulkner to take a pill which he had hidden in his sock. He then told Breckinridge to put Nicolette in the rental car and to bring the other child to the house. Defendant took Faulkner's clothes and jewelry and left with Nicolette and Breckinridge.

After defendant and Breckinridge left her mother's home, Faulkner put on some of her mother's clothes, searched for and found the keys to her sister-in-law's car, and returned to her babysitter's house. When she arrived there, the babysitter's son called 911 and reported the incident. Faulkner was taken to the hospital by her mother. Emergency room personnel noted that she was crying and

4

visibly upset. A rape examination was performed, and a laceration near Faulkner's left eye was sutured.

Defendant was ultimately convicted at trial in this district of interstate domestic violence. While he was awaiting sentencing, the United States received information that defendant had hired Louis Bennett, a fellow inmate at the East Baton Rouge Parish Prison, to kill Faulkner. Bennett was subsequently interviewed by Special Agent (SA) Thomas M. McNulty of the Federal Bureau of Investigation (FBI).

According to Bennett, he was approached by defendant to "knock off" defendant's wife, and he agreed. Defendant agreed to pay Bennett $10,000 to carry out his plan. He provided Bennett with detailed information about Faulkner's residence, family, employment, and vehicles, including notes, photographs, maps, and a diagram of her home. He also gave Bennett specific instructions on how the murder should be committed. Among other things, he told Bennett to break into the home where Faulkner was living with her mother, step-father, and Nicolette. Once inside the home, Bennett was to go to the front bedroom and shoot Faulkner. Defendant told Bennett to try to keep Nicolette in another room during the murder but that, if Bennett could not do so, it would be okay because "she'll get over it." He also told Bennett that it would be okay to kill Faulkner's mother if necessary because he never liked her.

During the interview with SA McNulty, Bennett agreed to cooperate with the United States in investigating defendant. After bonding out of jail, Bennett had several recorded phone conversations with defendant. During the first conversation, defendant agreed to provide a small amount of money so that Bennett could purchase a gun. That evening, thirty dollars was wired to Bennett via Western Union. In a recorded call the next day, Bennett told defendant that he had purchased a twenty-five caliber gun but had only about four bullets. Defendant told Bennett to "[u]se all four" bullets. Bennett asked defendant if he was sure that he wanted to go through with the plan, and defendant advised that he was. The following day, Bennett told defendant that he had "taken care" of Faulkner and locked Nicolette in the home. Defendant promised payment but never came through.

### III. <u>The Law</u>

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), authorizes a sentencing court, on motion of the BOP or on motion of a defendant after exhausting administrative remedies, to reduce the defendant's term of imprisonment for "extraordinary and compelling reasons." Prior to enactment of the First Step Act in 2018, only the BOP was permitted to file a motion for compassionate release. Now, defendants are permitted to file such motions, but they must first exhaust BOP administrative remedies. The exhaustion requirement is satisfied if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or if 30 days have elapsed

6

"from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Consistent with the majority of courts, this Court has refused to create an exception to the exhaustion requirement for COVID-19. Doc. 181 at 2.

The statute authorizes relief only when a "reduction is consistent with applicable policy statements issued by the Sentencing Commission." See 18 U.S.C. § 3582(c)(1)(A); see also 28 U.S.C. § 994(a)(2)(C); 28 U.S.C. § 994(t). The policy statement regarding compassionate release is set out at U.S.S.G § 1B1.13, p.s. It provides that release is available only upon a finding by the court that "the defendant is not a danger to the safety of any other person or the community." U.S.S.G § 1B1.13(2), p.s. Under Application Note 1 to Section 1B1.13, three specific reasons for compassionate release are deemed "extraordinary and compelling" (under certain circumstances): serious medical condition, advanced age, and family circumstances. See U.S.S.G § 1B1.13, comment. (n.1(A)-(C)).

This Court has previously held that the COVID-19 pandemic does not qualify as a reason for compassionate release. See, e.g., United States v. Clark, Crim. No. 17-85-SDD, 2020 WL 1557397 at *4 (M.D. La. Apr. 1, 2020) (Dick, C.J.) (rejecting the notion that "the *fear* of contracting a communicable disease warrants a sentence modification"). As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." See United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).

Even when there are "extraordinary and compelling" reasons for a sentence reduction, "compassionate release is discretionary, not mandatory." United States v. Chambliss, 948 F.3d 691, 693 (5th Cir. 2020) (affirming denial of compassionate release despite defendant's eligibility). In exercising its discretion under the statute, a sentencing court is required to consider the sentencing factors set out in 18 U.S.C. § 3553(a) "to the extent that they are applicable." See id.; 18 U.S.C. § 3582(c)(1)(A); U.S.S.G § 1B1.13, p.s. As a result, an eligible defendant may be denied release to account for, among other things, his criminal history and the seriousness of his crimes. See Chambliss, 948 F.3d at 693-694.

## IV.    Argument

This Court has already decided that defendant's motion should be denied because he has not exhausted his administrative remedies and because he has not demonstrated an extraordinary and compelling reason for reduction in sentence. Defendant's amended motion—consisting of various exhibits—does not establish that he has exhausted his administrative remedies. Likewise, the amended motion does not provide an extraordinary and compelling reason for relief. As a result, the amended motion should be denied for the same reasons as the original motion.

The amended motion, at best, offers reasons to find that the Section 3553(a) factors support release. If defendant's exhibits are believed, defendant has been a model prisoner. But defendant's good behavior in prison does not outweigh the years of violent and cruel conduct that landed him in prison in the first place. Defendant was given a life sentence because of his history of violence against his

8

wife, the seriousness of the rape of which he was convicted, and the post-trial effort to murder his wife. Those factors have not changed, and a reduced sentence would not reflect the seriousness of the offense, promote respect for the law, provide just punishment, or deter others from committing similar crimes. See 18 U.S.C. § 3553(a)(2)(A) & (B).

Notably, there is not the slightest hint of remorse in either of defendant's motions. To the contrary, defendant seems intent on disputing his guilt and discrediting the victim—in other words, re-casting himself as the true victim. The amended motion includes an affidavit from defendant's trial counsel regarding certain actions at trial that defendant apparently contends amounted to deficient representation.[3] Doc. 182 at 55-56. In the affidavit, among other things, counsel admits to not "question[ing] certain witnesses about the victim's drug use." Id. at 56. The only conceivable reason for defendant to present the affidavit in this proceeding is to suggest that his conviction was wrongful. But, to make that suggestion is to undermine his claim of rehabilitation. As the Supreme Court has recognized, "[rehabilitation demands that the convicted defendant realize that 'he is justly subject to sanction.'" Engle v. Isaac, 456 U.S. 107, 127 n.32 (1982) (citation omitted). Defendant apparently refuses to acknowledge that he was justly convicted. His assertion of rehabilitation therefore rings hollow.

---

[3] The affidavit was attached to defendant's original Section 2255 motion, which was filed in 1999. See Doc. 80 at 81. Defendant's ineffectiveness of counsel claims based on the affidavit were rejected by the Honorable Frank J. Polozola, who presided over defendant's trial, in part because of the "overwhelming evidence of guilt." See Doc. 95.

9

Finally, defendant is not eligible for a sentence reduction because he has not demonstrated that he "is not a danger to the safety of any other person or the community."  See U.S.S.G § 1B1.13(2), p.s.  Admittedly, defendant has presented some evidence that he has behaved well in prison.  But, considering the nature of defendant's past violence, his behavior in prison is of little value in predicting his dangerousness if released.  Defendant is a domestic abuser—a bully who preyed upon an intimate partner who was weaker than him by nature and therefore defenseless against his abuse.  It is fair to assume that the correctional officers and other male prisoners at FCI Petersburg (Medium) are not so defenseless.  So it is not surprising that defendant has not been violent against them.  Defendant's prison record is simply not an accurate barometer of his brand of dangerousness.  There is no reason to doubt that defendant would easily fall back into his prior pattern of abuse once he is free and finds a vulnerable woman to bully and threaten and beat.  And, given defendant's lack of remorse, there is every reason to believe that he remains motivated to kill or harm Faulkner—in retaliation for her testimony against him, if nothing else.  In the end, defendant has provided no basis for this Court to find that he would not pose a danger if released.

**V.**     **Conclusion**

For the above reasons, defendant's amended motion for compassionate release should be denied.

>                    UNITED STATES OF AMERICA, by
>
>                    BRANDON J. FREMIN
>                    UNITED STATES ATTORNEY
>
>
>                    /s/ M. Patricia Jones
>                    M. Patricia Jones, LBN 18543
>                    Assistant United States Attorney
>                    777 Florida Street, Suite 208
>                    Baton Rouge, Louisiana  70801
>                    Telephone: (225) 389-0443
>                    Fax: (225) 389-0561
>                    E-mail: patricia.jones4@usdoj.gov

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| *versus* | : | CRIMINAL NO. 97-5-SDD |
| | : | |
| BILLY DOUGLAS | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing United States' Response in Opposition to Defendant's Amended Motion for Compassionate Release was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the court's electronic filing system and to Pro Se Defendant via U.S. Mail at:

> Billy Douglas
> 18753-001
> Federal Correctional Institution
> P.O. Box 1000
> Petersburg, VA 23804

Baton Rouge, Louisiana this 29th day of May, 2020.

/s/ M. Patricia Jones
M. Patricia Jones, LBN 18543
Assistant United States Attorney
