UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

BILLY DOUGLAS,

      Movant,

v.

      Crim. No.3:97-cr-00005-SDD-EWD-1

UNITED STATES OF AMERICA,

      Respondent.

_____/

**RECEIVED**

**NOV 1 3 2023**

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DEPUTY CLERK

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, BILLY DOUGLAS ("Douglas"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Douglas's health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Douglas. Allowing Douglas to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus and unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

# I. <u>STATEMENT OF THE CASE</u>

On February 18, 1997, the Grand Jury for the Middle District of Louisiana, Baton Rouge Division, returned a one (1) count Indictment charging Douglas. See Doc. 12.[1] Count 1 charged Douglas with Interstate Domestic Violence, in violation of 18 U.S.C. § 2261(a) (1). *Id.*

On April 28, 1997, a 3-day jury trial commenced. No Doc. Entry.

On May 1, 1997, the grand jury returned a guilty verdict as to Douglas on Count 1 of the Indictment. See Doc. 47.

On September 4, 1997, Douglas was sentenced to a total term of Life incarceration, $1,728 Restitution,  and a $100 Mandatory Special Assessment Fee. See Doc. 64.

On September 10, 1997, Douglas timely filed a Notice of Appeal, which the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") affirmed his conviction and sentence on December 1, 1998. See Docs. 65, 75.

On November 3, 1999, Douglas filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See Doc. 80.

---

[1] "Doc." refers to the U. S. District Court for the Middle District of Louisiana, Baton Rouge Division, Docket Report in Criminal Number 3:97-cr-00005-SDD-EWD-1, which is immediately followed by the Docket Entry number.

On December 22, 2000, the District Court denied Douglas's § 2255 Motion. See Doc. 96.

On January 8, 2001, Douglas filed a Notice of Appeal re: denial of his § 2255 Motion and a Petition for a Certificate of Appealability. See Docs. 97, 99.

On June 5, 2001, a Judgment from the 5th Circuit was entered, dismissing the appeal due to failure to timely pay the docketing fee. See Doc. 104. Douglas paid the appeal fees on August 10, 2001, [see Doc. 104 at 3], and a Motion to reinstate the appeal was granted on August 23, 2001. See Doc. 105.

On January 17, 2003, the 5th Circuit entered a judgment denying Douglas' Petition for a Certificate of Appealability. See Doc. 106.

On March 31, 2003, a judgment issued as the mandate to Douglas for an order authorizing him to file a Successive§ 2255 Motion in the District Court. See Doc. 107.

On June 26, 2003, Douglas filed the Successive § 2255 Motion, which was dismissed on March 26, 2004. See Docs. 109, 136.

On April 15, 2004, Douglas filed a Notice of Appeal , which was denied on April 20, 2004. See Docs. 137-138.

On June 22, 2005, Douglas filed another § 2255 Motion, which was dismissed on July 7, 2005. See Docs. 149, 151.

3

On August 16, 2005, Douglas filed Notice of File COA from the denial of Rule 60(b) Motion, a Notice of Appeal, and a Motion for Certificate of Appealability. See Docs. 153-155. On August 19, 2005, the Motion for Certificate of Appealability was denied. See Doc. 156. On March 21, 2006, a Mandate from the Fifth Circuit denied the COA. See Doc. 163.

On June 9, 2014, Douglas filed § 2255 Motion, which was denied on April 23, 2015. See Docs. 165, 167.

On July 21, 2016, Douglas filed another § 2255 Motion, which was denied without prejudice on November 14, 2017. See Docs. 169, 171.

On January 19, 2018, Douglas filed a Notice of Appeal re: denial of his § 2255 Motion. See Doc. 173. On the same day, Douglas filed a Memorandum in Support of Reinstatement on § 2255 Motion, which was denied on March 26, 2018. See Docs. 172, 176.

On May 4, 2020, Douglas filed a Motion to Reduce Sentence Pursuant to 18 USC 3582(c)(1)(A), which was denied on May 11, 2020. See Docs. 180-181.

On July 1, 2020, Douglas filed a Notice of Appeal re: denial of his Motion for Compassionate Release, which the Fifth Circuit denied as frivolous. See Docs. 188, 195.

## II. <u>DISCUSSION</u>

As a preliminary matter, Douglas respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally.  See United States v. Kayode, 777 F.3d 719 (5th Cir. 2014) (*Pro se* pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

### A.   <u>Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence</u>

This Court has the power to adjust Douglas's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.   <u>Historical Framework</u>

Congress first enacted the compassionate release provisions in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation

provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id*. at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id*. Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

2.      Section 3582(c)(1)(A) is Not Limited To Medical, Elderly
         or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes

"extraordinary and compelling reasons" to the United States Sentencing Commission.

28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered

"extraordinary and compelling reasons" for sentence reduction, including the criteria

to be applied and a list of specific examples." Congress provided one limitation to

that authority: "[r]ehabilitation of Douglas alone shall not be considered an

extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could,

however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling

reasons" as follows:

(A)    Extraordinary and Compelling Reasons - Provided the defendant
       meets the requirements of subdivision (2), extraordinary and
       compelling reasons exist under any of the following
       circumstances:
       (i)     The defendant is suffering from a terminal illness.
       (ii)    The defendant is suffering from a permanent physical or
               medical condition, or is experiencing deteriorating physical
               or mental health because of the aging process, that
               substantially diminishes the ability of the defendant to
               provide self care within the environment of a correctional
               facility and for which conventional treatment promises no
               substantial improvement.
       (iii)   The death or incapacitation of the defendant's only family
               member capable of caring for the defendant's minor child
               or minor children.

> (iv)   As determined by the Director of the Bureau of Prisons,
> there exists in the defendant's case an extraordinary and
> compelling reason for purposes of subdivision (1)(A).
> USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under § 3582(c)(1)(A), even when the inmates met the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program (Apr. 2013). The Office of the Inspector General also found that the BOP failed to provide adequate guidance to staff on the criteria for compassionate release, failed to set time lines for review of compassionate release requests, failed to create formal procedures for informing prisoners about compassionate release, and failed to generate a system for tracking compassionate release requests. *Id.* at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

### 3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court

can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

4.    Douglas Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

Douglas has filed a request for compassionate release to the Warden, at FCI Edgefield and he has not received a response yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Douglas's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.    Douglas' Current Conditions of Confinement and Health Conditions**

Douglas, age 56, suffers from incurable, progressive diseases, from which Douglas will never recover, to wit: Hypercholesterolemia and Chronic Viral Hepatitis C. He also suffers from Esophageal Reflux, osteoarthrosis, enlarged prostate with lower urinary tract symptoms, eye, dental, and skin problems. See Exhibit 1.

**Facts:**

**Hypercholesterolemia.** This is a lipid disorder in which your low-density lipoprotein (LDL), or bad cholesterol, is too high. This makes fat collect in your arteries (atherosclerosis), which puts you at a higher risk of heart attack and stroke. Atherosclerosis is the main cause of cardiovascular disease, which

10

is the reason for more deaths than anything else in the world. Hypercholesterolemia is very common. About 1 out of every 20 people has hypercholesterolemia. Nearly 1/3 of American adults have high LDL-C.

There are no symptoms of hypercholesterolemia in most people. However, if you have severe hypercholesterolemia, you may have cholesterol deposits on your eyelid skin (xanthelasma) or connective tissue (xanthoma). Also, you may have cholesterol in your eye. This is called a corneal arcus.

Hypercholesterolemia can lead to cardiovascular issues, such as:

- Stroke.
- Coronary artery disease.
- Peripheral artery disease.

***Chronic hepatitis C.*** It is a slowly progressive disease that often results in cirrhosis and its complications. Hepatitis C is the leading indication for liver transplantation in the United States today.

Chronic HCV infection occurs in 50%–80% of cases, leading to cirrhosis and HCC. In the chronic condition, HCV does not appear to be cytopathic. Cirrhosis is facilitated by external factors such as chronic alcohol consumption, and patients with cirrhosis become sensitive to developing HCC. Initial symptoms of HCV infection are often extrahepatic, most commonly involving the joints, muscle, and skin. Advanced or decomposed liver disease is manifested by synthetic dysfunction and portal hypertension, such as mental status changes (encephalopathy), ankle edema and abdominal distension, and hematemesis or melena (variceal bleeding). Acute HCV infection is usually asymptomatic. The chronic state may or may not be symptomatic, but in this case, fatigue is the predominant system. Twenty percent of the patients with chronic HCV infection have been estimated to move to cirrhosis, and patients with HCV-induced cirrhosis become prone to develop HCC. In the United States, HCC arises in 3%–5% of patients with HCV-induced cirrhosis each year.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Accordingly, Douglas must be granted a compassionate release due to diseases which may worsen if not treated properly.

**C.    Douglas Has "Extraordinary and Compelling Reasons" For Compassionate Release**

The principles of Compassionate Release allow for Douglas's early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

1.    Proposed Amendment: First Step Act— Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

This proposed amendment responds to the First Step Act of 2018, Pub. L. 115–391 (Dec. 21, 2018) ("First Step Act" or "Act"), which contains numerous provisions related to sentencing, prison programming, recidivism reduction efforts, and reentry procedures. Specifically, the sentencing reform provisions of the Act (1) amended the sentencing modification procedures set forth in 18 U.S.C. § 3582(c)(1)(A) to allow a defendant to file a motion seeking a reduction in the defendant's term of imprisonment under certain circumstances; (2) reduced certain enhanced penalties imposed pursuant to 21 U.S.C. § 851 for some repeat offenders

12

and changed the prior offenses that qualify for such enhanced penalties; (3) broadened the eligibility criteria of the "safety valve" provision at 18 U.S.C. § 3553(f); (4) limited the "stacking" of certain mandatory minimum penalties imposed under 18 U.S.C. § 924(c) for multiple offenses that involve using, carrying, possessing, brandishing, or discharging a firearm in furtherance of a crime of violence or drug trafficking offense; and (5) allowed for retroactive application of the Fair Sentencing Act of 2010. Revisions to the Guidelines Manual may be appropriate to implement the Act's changes to 18 U.S.C. § 3582(c)(1)(A).

The proposed amendment would also revise the list of "extraordinary and compelling reasons" in §1B1.13 in several ways.

The sixth proposed amendment would add a new category ("Unusually Long Sentences") **providing that if a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason,** but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances. See USSG §1B1.13 (b)(6).

13

In this case, Douglas already served his sentence for at least 10 years and this presents as an "extraordinary and compelling reasons." Hence, Douglas is asking this Court to grant his compassionate release.

2.   Criminal History Calculation: Adjustment for Certain Zero-Point Offenders

The proposed 2023 criminal history amendment makes two (2) important changes to the Chapter Four criminal history rules, both of which would reduce the guideline's range for certain offenders. First, the amendment eliminates the use of "status points" – which are added if the defendant committed the instant offense "while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status" – in certain circumstances. As amended, the "status points" provision under redesignated USSG §4A1.1(e) applies only to offenders with more serious criminal histories under the guidelines. "Status points" will no longer apply to offenders with less serious criminal histories – i.e., six or fewer criminal history points – even if the instant offense was committed while the offender was under a criminal justice sentence.

Second, the proposed amendment creates a new Chapter Four guideline, which provides a decrease of two (2) levels from the offense level for offenders who did not receive any criminal history points under Chapter Four and whose instant offense did

14

not involve certain proscribed criteria. The proposed language of USSG §4C1.1 defines "zero-point offenders" as those offenders with no criminal history points, including (1) offenders with no prior convictions; (2) offenders who have prior convictions that are not counted because those convictions were not within the time limits set forth in subsection (d) and (e) of USSG §4A1.2; and (3) offenders who have prior convictions that are not used in computing the CHC for reasons other than their "staleness" (e.g., sentences resulting from foreign or tribal court convictions, minor misdemeanor convictions, or infractions).

It is apparent that Douglas has no prior convictions or is a zero-point offender. Therefore, he should benefit from an adjustment intended to benefit offenders with no criminal history.

3. *Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000)

The Sixth Amendment provides that those "accused" of a "crime" have the right to a trial "by an impartial jury." This right, in conjunction with Due Process, requires that each element of a crime be proved to the jury beyond a reasonable doubt. *In Re Winship*, 397 U. S. 358 (1970). The substance and scope of this right depend upon the proper designation of the facts that are elements of the crime.

*Apprendi* concluded that: "any facts that increase the prescribed range of penalties to which a criminal defendant is exposed " are elements of the crime, *Id*.,

15

at 490, and thus the Sixth Amendment provides defendants with the right to have a jury find those facts beyond a reasonable doubt." *Id.* at 484.

The juxtaposition of these two decisions shows that: (1) the Supreme Court knew how to announce a new procedural rule; and it chose to do just that in *Apprendi* ("The substantive basis for New Jersey's enhancement is. . . not at issue; the adequacy of New Jersey's procedure is"). *Apprendi*, 530 U. S., at 475; but (2) it chose not to do so in the *Alleyne* decision, by redefining what constitutes an element of a crime.

In *Apprendi*, the Court repeatedly refused to make a distinction between "sentencing factors" and "elements of the offense," describing two ways in which Courts treat factual issues in criminal proceedings. In a footnote, for example, the Court noted that when a fact increases the defendant's punishment beyond the statutory maximum, that fact is best characterized not as a "sentencing factor," but as "the functional equivalent of a greater offense." *Apprendi*, 530 U. S., at 494, n.19. The term "element" was used simply as shorthand for a set of procedural requirements. It meant only that it must be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. The *Apprendi* decision dictates only who must decide certain factual disputes (Judge v. Jury) and under what standard of proof (Preponderance v. Reasonable Doubt) that must be decided. It does not determine which facts are "elements of a crime."

Douglas was sentenced only by the jury for 5 years' imprisonment, the judge enhanced his sentence by using preponderance of evidence in witness testimony, prior arrest that never resulted in a conviction, and some of the things that he was never even arrested for, never plead guilty or admitted any guilt. The court failed to consider that Douglas had no prior felony convictions and the jury was correct in sentencing him for only 5 years for this instant case since: (1) there was no dead victim, (2) no permanent disfigurement or life threatening bodily injury to the victim, and (3) the offender use*s* ~Did Not~ a dangerous weapon during the offense. None of these fall under the penalties on 18 U.S. Code § 2261. Although, there was one kidnapping charge involving Faulkner, a Deposition Hearing was conducted in the Hugo Black Federal District Court in Birmingham, Alabama, wherein, the charges were dismissed because the Court accepted somebody's statement that Douglas kidnapped his former wife from El-Paso, Texas, when in fact, Faulkner was at Douglas' home and she even had access to his phone and car– this incident strongly opposed the allegation resulting to the dismissal of the charge. In William Robert Gill ("Gill"), Douglas' trial counsel's Sworn Statement, stating that he failed to object and call the attention to the jury, when the prosecution presented evidence of Douglas' previous abductions of Faulkner. See Exhibit 3. His counsel failed to protect these records from the hearing and present this as an evidence  to further prove that Douglas has no felony

conviction.

During Douglas' direct appeal, he argued that the sentencing judge sentenced him outside of the sentencing guidelines. At the time, the Supreme Court ruled in *U.S. v. Harris*, 536 U.S. 545 (2002), says that a judge can use preponderance of the evidence to enhance a sentence. Douglas' appeal was denied, but later on while his initial § 2255 Motion was pending, the U.S. Supreme Court excepted and ruled on *U.S. vs. Apprendi*, 120 S. Ct. 2348.

The Court conceded that they were wrong in *Harris v. United States*, 2362-2363(2000), they reversed their ruling and now says that a judge can't use preponderance of the evidence to enhance a sentence, it must be listed in the indictment, presented to a jury, and a jury will determine is guilty of such enhancements. More so, the government and the Court agrees that *Apprendi* applies to Douglas, however, it is not retroactive. It is a known fact that *Apprendi* is not retroactive on collateral review, however, there should not be a question of retroactivity if Douglas already argued the issue before *Harris* was ordered to be reversed in light of *Apprendi*. The Supreme Court recently heard *U.S. v. Haymond*, 139 S. Ct. 2369 (2019), it establishes *Apprendi* is retroactive, the Court said, ("Our appplication of *Apprendi*'s rule must honor the longstanding common-law practice in which the rule is rooted" (quoting *Cunningham v. California*, 549 U.S. 270, 281,

127 S. Ct. 856 166 L. Ed. 2d. 856 (2007)). In a plurality decision mandatory minimum was deemed unconstitutional because it violated defendant's right to trial by jury under the 5th and 6th Amendments. The judgment was further vacated. A mandatory minimum 5-year sentence that comes into play only as a result of additional judicial factual findings by a preponderance of the evidence cannot stand. Only a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government. In the 5th Amendment, that no one may be deprived of liberty without "due process of Law." Together, these pillars of the Bill of Rights ensure that the government must prove to a jury every criminal charge beyond a reasonable doubt, an ancient rule that has "extended down centuries." *Apprendi v. New Jersey*, 530, U.S., 466, 477, 120 S.Ct. 2348, 147 L. Ed. 2d 435 (2000). Another reason that retroactivity should not be in question, is because the law and concept of *Apprendi* has been in the Constitution ever since it was written, this is explained in the *Haymond* case. Lastly, in *U.S. v. Wheeler*, it says that a person can be guilty of their crime but innocent of their sentence.

Accordingly, the Court should reverse their decision on Douglas' apppeal, too and have him resentence.

4.    *Concepcion v. United States*, 597 U.S. ___ (2022)

The question presented is "[w]hether, when deciding if it should 'impose a reduced sentence' on an individual under Section 404(b) of the First Step Act of 2018, 21 U.S.C. §841 note, a district court must or may consider intervening legal and factual developments." For more than three decades, federal drug laws treated one gram of crack-cocaine as the equivalent of 100 grams of powder cocaine for purposes of setting the statutory minimum and maximum sentence. To reduce "unjustified race-based differences" in sentences for crack and powder cocaine offenses, the Fair Sentencing Act of 2010 substantially increased the quantity of crack cocaine needed to trigger the mandatory minimum sentence. The First Step Act of 2018 makes the Fair Sentencing Act's reforms retroactive. As relevant here, Section 404(b) of the First Step Act allows a person convicted of crack-cocaine offenses and sentenced before August 3, 2010, to receive a reduced sentence "as if" Section 2 of the Fair Sentencing Act were "in effect at the time the covered offense was committed."

In 2008, petitioner Carlos Concepcion pleaded guilty to a single count of possession with intent to distribute, and distributing, at least five grams of crack cocaine. At sentencing, the district court applied the 2008 edition of the federal Sentencing Guidelines to calculate the sentencing range. The district court made two calculations under the 2008 Guidelines to determine which sentencing range would

govern: one based on the drug quantities under U.S.S.G. § 2D1.1(c), and the other using the career-offender provisions of U.S.S.G. § 4B1.1. The district court treated Concepcion as a "career offender" under U.S.S.G. § 4B1.1(a), reasoning that he met the requirements of that section due to prior convictions for controlled-substance offenses and prior convictions for carjacking, robbery, and assault. The district court then sentenced Concepcion to 19 years'—or 228 months'—imprisonment. After the First Step Act became law, Concepcion sought relief under Section 404(b) of the Act. He made three arguments. First, he asserted that Section 2 of the Fair Sentencing Act reduced the statutory maximum sentence applicable to his offense from life to 30 years, reducing his career offender Guidelines range from 262 to 327 months to 188 to 235 months. Second, Concepcion argued that he was no longer a career offender under the 2018 Guidelines. That was because (1) one of the prior drug convictions on which his career-offender status was based had been vacated and a notice of nolle prosequi entered; and (2) his convictions for carjacking, robbery, and assault no longer qualified as "crimes of violence" under the Sentencing Guidelines based on an intervening Supreme Court decision. Third, Concepcion invoked the factors to be considered in imposing a sentence under 18 U.S.C. §3553(a), noting his post-offense rehabilitation. The district court denied relief, adopting the holding of the Fifth Circuit that district courts may not consider any intervening legal developments in a

21

First Step Act resentencing. The district court therefore declined to reduce Concepcion's sentence based on changes to the Guidelines, the vacatur of one of prior his convictions, or his submission of current facts concerning the Section 3553(a) factors. The First Circuit affirmed. 991 F.3d 279.

The First Circuit held that "[t]he permission granted in section 404(b) is only permission to 'impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect,' not to conduct a plenary resentencing." The court stated that the First Step Act "authorizes the district court to consider the state of the law at the time the defendant committed the offense, and change only one variable: the addition of sections 2 and 3 of the Fair Sentencing Act as part of the legal landscape." The First Circuit went on to conclude that allowing First Step Act defendants to invoke current law "would put crack cocaine defendants who had committed covered offenses in a more advantageous position than other criminal defendants generally." Concepcion's petition notes that "[f]our circuits require a district court to consider intervening case law, updated sentencing Guidelines, or intervening factual developments when resentencing. Five circuits allow district courts to ignore those issues. And three circuits bar consideration of intervening law or updated Guidelines entirely."

On the merits, Concepcion argues that "the First Step Act authorizes district courts to 'impose a reduced sentence.' As other federal sentencing statutes make clear, the term 'impose' capaciously allows a court to consider any thing relevant to what is an appropriate sentence." (Citation omitted.) He insists that "[w]hen a district court imposes a reduced sentence under the First Step Act, it must calculate 'the sentencing range established' under the Sentencing Guidelines as it exists at the time of the motion's adjudication. 18 U.S.C. § 3553(a)(4), (5)." He also says that "[t]he district court also must consider all § 3553(a) factors, including factual ones such as 'the history and characteristics of the defendant,' 18 U.S.C. § 3553(a). And, as th[e] Court held in *Pepper v. United States*, a district court cannot artificially limit itself to a defendant's past history and circumstances while ignoring more recent developments. 562 U.S. 476, 488-89 (2011)."

On June 27, 2022, the Supreme Court issued a decision in favor of Concepcion. The Court held that by instructing courts to "impose a reduced sentence as if" the Fair Sentencing Act were in effect, the First Step Act requires, at minimum, that courts consider any intervening changes of law or fact raised by the defendant when exercising their discretion to reduce a sentence.

In light of *Concepcion*, it insists that a district court must calculate and establish a sentence under the Sentencing Guidelines as it exists at the time of his

motion adjudication. Thus, the same reasoning should apply to Douglas since his supposed sentencing guideline should not be more than 5 years, pursuant to 18 U.S. Code § 2261(b)(5). In sum, the Court disregarded the jury's verdict

5.    Erroneous Obstruction of Justice Enhancement

After Douglas was incarcerated in U.S. Penitentiary Beaumont, TX, Faulkner (former wife, government's main witness, and alleged victim), went through extreme measures to get into Douglas' visiting list and even made several trips to visit him. See Exhibit 2. She had a signed and notarized statement claiming that her entire testimony was a lie with supporting reasons that she mentioned. His counsel, Robert Ratliff ("Ratliff") jumped on this but Faulkner withdrawn her testimony. His wife confessed to him that the government went through the victims impact group, to threaten her with prison time if she refuse to withdraw her statement.

Furthermore, Douglas received a sentence enhancement for obstruction of justice. The Presentence Probation Officer informed the judge that the sentence did not acquire the said enhancement because the government has already admitted that the obstruction was aimed at the ongoing State investigation and not the Federal. To be enhanced for obstruction, there has to be an ongoing Federal investigation. Douglas has been convicted by a jury and was then waiting to be sentenced, concluding that there was no federal investigation at the time. See Exhibit 2. The

24

judge increased his criminal history points, even though, Douglas had no prior felony convictions, aside from DUI (was ruled out as not a "crime of violence"), ruled in *U.S. v. Begay* even though it is not retroactive. *Id.*

If there is someone who obstructed justice in this case, it would be the government and not Douglas. They used their power to alter the outcome of his sentence and Faulkner, testifying against him was a major ground for him to be convicted. Therefore, Douglas' enhancement for obstruction of justice should be removed and he should be resentenced accordingly.

6. <u>Requests Based on Non-Medical Circumstances– Incapacitation of the Prisoner's Wife Due to Health Issue</u>

In this case, Douglas requests for Reduction in Sentence ("RIS") because his wife, Patricia Clayton ("Clayton"), was diagnosed to have Arterial Bruits. See Exhibit 1. Due to her condition, she needs a valve replacement. Although, Clayton already have a schedule with her cardiovascular surgeon, she does not have anyone to help her move around before, during, and after her surgery and requires a full-time attention which only Douglas could provide, as he is her sole caregiver.

Clayton and Douglas, they pray for this Court's leniency to grant him an instant compassionate release.

The most significant change to compassionate release is that the Act provides prisoners the power to file a motion for compassionate release if they can demonstrate they have tried and failed to convince the BOP to do so for them. Before passage of the First Step Act a denial by the BOP was not appealable.

**Prisoners now have the right to file a motion** under 18 U.S.C. § 3582(c)(1)(A)(i) directly with the court under certain circumstances:

- Prisoners may file a motion after the earlier of
  o having "fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion. . ." or
  o 30 days after the date the warden received a request for compassionate release from the prisoner.

- A prisoner **exhausts administrative rights** when one of two things happens:
  o The Central Office of the BOP rejects a warden's recommendation that the BOP file a compassionate release motion, or
  o The warden refuses to recommend the BOP file a compassionate release motion and the prisoner appeals the denial using the BOP's Administrative Remedy Program.

In this case, Douglas' wife requires immediate surgery due to the medical findings made by Asad M. Karim ("Karim"), MD. On December 21, 2022, it showed on her Upper Extremity Arterial Test that she only has one artery working and was 60% blocked. This condition may need a valve replacement and the only way to find out is to undergo several more tests. To do these, Clayton needs her husband to be

26

beside her and help her with all the medical challenges that she is going through right now. Her condition could possibly affect her capacity to function or needs general supervision as it may worsen if not treated properly.

Because of the urgency imposed by such unforseen event – incapacitation of Clayton to provide the requisite elevated care to herself, it is important that the sentencing court decides instantaneously whether to reduce Douglas's sentence after considering the factors in section 3553(a) and if it finds that "extraordinary and compelling reasons" warrant a reduction.

Douglas, currently housed at the FCI Edgefield. He has no violent convictions prior to the instant offense. Accordingly, Douglas is not a threat to society. Because of the relatively limited risk of recidivism and the relatively limited potential danger to the community of his release, he was sentenced to Life imprisonment, which was unusually and harsh sentence for someone whose been a zero-point offender. Since his incarceration, in 1997, Douglas has completed courses and workshops in the BOP. Generally, Douglas is well capable of working to support and provide for himself and his wife. It is imperative that Douglas cares for Clayton, who wishes to be with Douglas during this difficult time.

It is also essential to note that Douglas does not have ties to large-scale criminal organizations, gangs, or cartels nor does he have history of violence. With

27

the various people who work in the federal prison, they could prove and seen that indeed, Douglas maintained a clear record during his incarceration Therefore, Douglas qualifies under the limited circumstances that authorize such a motion, and because of the relatively limited risk of recidivism and the relatively limited potential danger to the community of his release.

### 7.    Douglas' Remarkable Rehabilitation

Since Douglas' incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 2. Throughout the time he has spent in prison, Douglas has worked long and hard and diligently at his rehabilitation. In fact, Douglas has been assigned to various work assignments, making him more productive and prepared to the life he would have once released. Additionally, his Discipline History showed as "NO INCIDENT REPORTS FOUND IN THE LAST 6 MONTHS," had Douglas not been serious of rebuilding himself, his records must show otherwise due to successfully completed different programs which made him acquire more useful skills. Hence, there can be no genuine safety concerns on his release. His extraordinary rehabilitation shows that he is ready for re-entry. Douglas's incarceration, he has become reflective and empathetic matured responsible man.

Furthermore, the length of time Douglas has spent in prison is more than enough to change as well as, he had improved his life with the skills he learned during his incarceration. Douglas has had many years to reflect on his past mistakes and is remorseful for his past actions. Additionally, he has been assigned to different jobs in prison and his acquired certificates in recreational programs has been commendable through the number of appreciation certificates which he received as a Kinesiology, Yoga, Wellness Instructor, and Softball Commissioner. He has been an advocate to the wellness of his co-inmates and this is essential in maintaining his clean records in BOP.

S. Jenkins, Associate Warden/Supervisor of Industries; C. Moore, Factory Manager; and C. Johnson, Fabric Foreman Supervisor, wrote a letter attesting that Douglas has been an outstanding leader in FCI UNICOR during his 3-year employment there. They added that he had shown good relationship with other inmates and staff, including excellent work evaluations that exhibited how hardworking he was, Douglas has completed several articles which helped the factory to be granted contracts resulting to receipt of multiple contract orders– all because of Douglas' diligence. See Exhibit 2.

D. Thomas, UNICOR Specialist; L. Robinson, D-4 Unit Counselor; S. King, BOP Operational Accountant; Dorothy Barnes, Assistant Business Manager - FCC

Yazoo City; and Robert Hampton, Quality Manager. They all expressed the same observations of how Douglas diligently perform his duties despite challenges that the other departments encountered during his employment with them. They all believe that he takes pride in his work and he is extremely dependable and responsible. *Id.*

C. Smith, Supervisor at FCI Edgefield; D. Wells, Senior Correctional Officer at FCI Edgefield; and Officer Jose Figueroa, an employee at FCI Edgefield, had observed the exceptional character development that Douglas displayed over the years that he has been incarcerated. These employees at FCI Edgefield believed that Douglas demonstrated equal treatment to every inmates he met. With these testimonies and them, witnessing all of his hardwork to become a better person deserves a compassionate release grant. *Id.*

       8.    <u>Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Granted Compassionate Release</u>

With respect to the need to avoid unwarranted sentencing disparities, Douglas urges the Court to consider the recent compassionate release grants, as follows:

> *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020)
> - "Second, our reasoning on PLRA's exhaustion requirement does not foreclose federal prisoners from seeking relief under the First Step Act's provisions for compassionate release. See 18 U.S.C. § 3582(c)(1)(A)(i). Though that statute contains its own administrative exhaustion requirement, several courts have concluded that this requirement is not absolute and that it can be

waived by the government or by the court, therefore justifying an exception in the unique circumstances of the COVID-19 pandemic."
- Higginson concurrence

*United States v. Franco*, No. 20-60473, 2020 WL 5249369, at *2 (5th Cir. Sept. 3, 2020)
- Franco notes that she "is housed at a Residential Reentry Management Facility, which has no warden." But this apparent problem has a simple solution. Bureau of Prisons regulations define the "warden" to include "the chief executive officer of … any federal penal or correctional institution or facility."
- Recognizes exhaustion not necessary after 30 days

*United States v. Gonzalez*, 2020 WL 5352078, at *1 (5th Cir. Sept. 4, 2020)
- "Contrary to Gonzalez's contention, there is no indication in the district court's order that it treated U.S.S.G. § 1B1.13 "as the dispositive boundary of what may be judicially determined to be extraordinary and compelling reasons for a sentence reduction for medical reasons." Rather, the order's reference to the Guidelines should be fairly read as one step in the district court's own determination of whether extraordinary and compelling reasons warrant a reduction of Gonzalez's sentence. The district court was free to determine that Gonzalez's need for dialysis, without more, was not an extraordinary and compelling reason for compassionate release"

Given the length of his imprisonment, his personal rehabilitation, deeply felt remorse, incapacitation of the Douglas' wife, and declining health condition, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

31

Under 18 U.S.C. § 3582(c)(2), to modify Douglas' sentence, taking into account the advisory nature of the guidelines after *Brooker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Finally, the combination of factors, health conditions, COVID-19 risk, as well as post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Douglas. More so, his BOP record does not show that he is violent or a threat to public safety.

If granted compassionate release, Douglas has a secured place to live in and could acquire an employment, too. Further information about these release plans upon request.

Accordingly, for the abovementioned reasons, the Court should reconsider his motion due to substantial extraordinary and compelling reasons. As his 1997 sentence resulted in a longer sentence, this could be deemed a miscarriage of justice.

## III. <u>CONCLUSION</u>

For the above and foregoing reasons, Douglas prays this Court would consider his Motion for Reconsideration of Compassionate Release pursuant to 18 U.S.C. §

32

3582(c)(1)(A) and First Step Act of 2018, because he has exhausted the available administrative remedy and demonstrated that "extraordinary and compelling reasons," in light of *Concepcion* and *Apprendi,* based on unwarranted disparity among Defendants being sentenced today under a different sentencing structure warrant his compassionate release him to home confinement or hold a hearing as soon as possible. Finally, Douglas asserts that his sentence is now disparate relative to Defendants whose compassionate release have been granted.

Respectfully submitted,

Dated: November 2, 2023

*Billy Douglas*

BILLY DOUGLAS
REG. NO. 18753-001
FCI EDGEFIELD
FEDERAL CORR. INSTITUTION
P.O. BOX 725
EDGEFIELD, SC 29824
Appearing *Pro Se*

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2, 2023, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U.S. Mail, postage prepaid, to Robert A. Ratliff, at Shields, Ratliff, Green & Kern, P.O. Box 2353, Mobile, AL 36652.

*Billy Douglas*

BILLY DOUGLAS