# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA      :
                               :
      *versus*                  :        CRIMINAL NO. 97-5-SDD
                               :
BILLY DOUGLAS              :

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Defendant Billy Douglas has filed another motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Doc. 198. For the reasons explained herein, the United States submits that Douglas has failed to exhaust administrative remedies as to certain claims, which should be denied without prejudice; as to the remaining claims, the motion should be denied on the merits, because Douglas has failed to establish extraordinary and compelling reasons justifying his release; he would pose a danger if released; and the sentencing factors under 18 U.S.C. § 3553 continue to weigh against his release.

## I.    Background

Douglas is serving a life sentence at the Federal Correctional Institution at Edgefield, South Carolina, a medium security prison, following his conviction for interstate domestic violence.[1] As detailed herein, Douglas was convicted after he raped and beat his wife, and following his conviction, he attempted to have his wife killed in retaliation for her trial testimony and in order to prevent her from testifying against him on related state charges.[2] Given the nature

---

[1] *See* https://www.bop.gov/inmateloc// (last visited November 29, 2023).

[2] *See* Doc. 86, p. 1. Unless otherwise noted, the facts underlying Douglas's crime of conviction are taken largely from the United States' memorandum in opposition to Douglas's first motion to vacate under 28 U.S.C. § 2255 (Doc. 86), as previously reiterated in response to a motion for compassionate release (Doc. 184). In addition, where applicable, the United States has also cited to Douglas's Presentence Investigation Report ("PSR") and Addendum thereto. Although the PSR and Addendum were not filed electronically at the time of disclosure in 1997, *see* Doc. 52, Douglas has previously submitted the substantive portions thereof as attachments to earlier filings. As such,

of certain claims made in the instant motion, it is appropriate to discuss the facts underlying Douglas's conviction and his abusive relationship with his victim (and spouse), Laura Faulkner.

Douglas and Faulkner were married in September 1990. As Faulkner testified at trial, prior to and during their marriage, she was physically, mentally, and sexually abused by Douglas. Douglas repeatedly threatened Faulkner, beat her, and forced her to engage in sexual activity. On several of the occasions when Faulkner managed to leave Douglas, he tracked her down and abducted her. Once, he kidnapped her at gunpoint from her place of employment in El Paso, handcuffed her legs, beat her, and said he was taking her to the desert to kill her; fortunately, she was rescued after witnesses called the police.[3] Douglas has admitted to prior kidnappings and abuse of Faulkner.[4]

In September 1996, Faulkner filed for a divorce from Douglas. She left their marital home in Alabaster, Alabama, and moved to Louisiana with their child, Nicolette Douglas, who was then only two years old. Just a couple months later, in November 1996, Douglas traveled to Louisiana and took Faulkner's car, leaving her with no means of transportation. PSR, p. 3, ¶ 4.

Approximately one week later, on November 21, 1996, Douglas and an acquaintance, Jeff Breckinridge, drove to Gonzales, where Faulkner was living with family. The two were also accompanied by a private investigator traveling in a separate vehicle. Douglas and Breckinridge traveled to Gonzales in the same car that Douglas had taken from Faulkner one week earlier. PSR, p. 3, ¶ 4. Douglas and Breckinridge checked into a motel room in Gonzales and then later drove to Kenner, where they rented a car. Although Douglas asked that Breckinridge rent both

those documents may be found in the record, as follows: PSR, pages 3 through 12, may be found at Record Document 109, pp. 25–34; and the entire Addendum may be found at Record Document 109, pp. 36–40.

[3] The disturbing facts of this violent incident, in addition to the facts underlying a separate kidnapping incident that occurred later that same year, are further detailed in Douglas's PSR, at pp. 6–7, ¶¶ 28, 29. Additional details of Douglas's history of domestic violence can also be found in the record, at Document 86.

[4] *See* Doc. 86, pp. 14–15.

the motel room and the car in his name, Breckinridge was unable to do so for lack of a driver's license, and Douglas ultimately conducted each transaction in his own name.

The next morning, Douglas purchased a pair of work gloves. Later, he and Breckinridge parked Faulkner's car near the interstate and drove the rental car to Faulkner's mother's home. Based on surveillance conducted by the private investigator earlier that day, Douglas was aware that Faulkner had brought laundry to her mother's house. Douglas hid behind the mother's residence and instructed Breckinridge to drive to the babysitter's house, wait for Faulkner to arrive to pick up Nicolette, and then follow Faulkner. Ultimately, Faulkner arrived, in a borrowed car, to retrieve Nicolette and her three-year-old niece from the babysitter's house, before driving the short distance to her mother's house, where Douglas was hiding, awaiting her arrival. Faulkner left the children in the car and approached the house to get her laundry. As she attempted to enter the home, Douglas attacked her. Douglas then instructed Breckinridge to take Faulkner's purse, hide the keys to her car, and watch the children, who were in Faulkner's car.

Douglas then forced Faulkner inside the home and demanded that she take off her clothes. When she refused, he slapped her, forcibly removed her clothing, pushed her onto her mother's bed, and raped her. Douglas then held Faulkner upside down and told her that he wanted to make her pregnant so that she would come back to him.

After raping his wife, Douglas put on the previously purchased pair of gloves and pulled the naked Faulkner around the home as he searched for items. He also demanded that Faulkner take off her jewelry. When she asked why, Douglas punched her in the eye. Thereafter, Faulkner gave her jewelry to Douglas. Douglas then went outside and instructed Breckinridge to cut the phone lines. While Douglas was outside, Faulkner dialed 911 on her mother's cordless phone and threw the phone under the table.

When Douglas came back in, he forced Faulkner to take a pill which he had hidden in his sock. He then told Breckinridge to put Nicolette in the rental car and to bring the other child to the house. Douglas took Faulkner's clothes and jewelry and left with Nicolette and Breckinridge. After the attack on Faulkner, Douglas and Breckinridge retrieved Faulkner's car, returned the rental car, and drove back to Alabama with Nicolette.

After Douglas and Breckinridge left her mother's home, Faulkner put on some of her mother's clothes, searched for and found the keys to her sister-in-law's car, and returned to her babysitter's house. When she arrived, the babysitter's son called 911. Faulkner was taken to the hospital, where emergency personnel noted that she was crying and visibly upset. A rape examination was performed, and a laceration near Faulkner's left eye was sutured.

In February 1997, Douglas was charged in a one-count indictment with traveling across state lines with the intent to injure, harass, and intimidate Faulkner, as a result of which Douglas intentionally committed crimes of violence and caused bodily injury to Faulkner, all in violation of 18 U.S.C. § 2261(a)(1). Doc. 12; PSR, p. 3, ¶ 1. Douglas proceeded to trial, and on May 1, 1997, the jury returned a verdict of guilty as charged. Docs. 45, 47, 49; PSR, p. 5, ¶ 14.

While he was awaiting sentencing in this case, the United States received information that Douglas had hired Louis Bennett, a fellow inmate at the East Baton Rouge Parish Prison, to kill Faulkner. Bennett was subsequently interviewed by Special Agent ("SA") Thomas M. McNulty of the Federal Bureau of Investigation ("FBI").

According to Bennett, he was approached by Douglas to "knock off" his wife, and Bennett agreed. Douglas agreed to pay Bennett $10,000 to carry out his plan. Douglas provided Bennett with detailed information about Faulkner's residence, family, employment, and vehicles, including notes, photographs, maps, and a diagram of her home. He also gave Bennett specific

instructions on how the murder should be committed. Douglas explained that there had been several recent burglaries in the Gonzales area and that he wanted the murder to be consistent with those burglaries. Among other things, Douglas told Bennett to break into the home where Faulkner was living with her mother, stepfather, and Nicolette. Once inside the home, Bennett was to go to the front bedroom and shoot Faulkner. Douglas further directed Bennett to take any money he could find, in order to make the crime scene look like a burglary had occurred, and told Bennett he might find cash in Faulkner's sock drawer or clothing pockets. Douglas told Bennett to try to keep Nicolette in another room during the murder but that, if Bennett could not do so, it would be okay because "she'll get over it." He also told Bennett that it would be okay to kill Faulkner's mother, if necessary, because he never liked her.

During the interview with FBI SA McNulty, Bennett agreed to cooperate with the United States. After bonding out of jail, Bennett had several recorded phone conversations with Douglas. During the first conversation, Douglas agreed to provide a small amount of money so that Bennett could purchase a gun. That evening, thirty dollars was wired to Bennett via Western Union. In a recorded call the next day, Bennett told Douglas that he had purchased a twenty-five caliber gun but had only about four bullets. Douglas told Bennett to "[u]se all four" bullets. Bennett asked Douglas if he was sure that he wanted to go through with the plan, and Douglas advised that he was. The following day, Bennett told Douglas that he had "taken care" of Faulkner and locked Nicolette in the home. Douglas promised payment but never delivered.

Prior to sentencing, a PSR was prepared and disclosed to the parties. Doc. 52; *see also* Doc. 109, pp. 25–40. Based on the original calculations in the PSR, Douglas faced a Guidelines range of 135 to 168 months; however, by statute, Douglas was subject to a maximum term of

imprisonment of life. PSR, p. 10, ¶¶ 51, 52.[5] The PSR likewise noted that an upward departure from the Guidelines may be appropriate given that Douglas's criminal history category did not reflect prior similar adult criminal conduct, namely, past abductions of Faulkner. PSR, p. 12, ¶ 63. During a status conference prior to sentencing, Judge Polozola advised the parties of his intent to upwardly depart from the Sentencing Guidelines. Docs. 58, 59.

Douglas appeared for sentencing on September 4, 1997, at which time the United States provided evidence of additional violent acts committed by Douglas against Faulkner, both prior to and during the course of their marriage. *See* Doc. 86, pp. 15–16. Prior to imposing sentence, Judge Polozola specifically found that Douglas had indeed entered into an agreement to have his wife murdered and further ruled on the United States' objections to the PSR, which ultimately increased Douglas's offense level under the Guidelines from 33 to 41, due to upward adjustments for serious bodily injury, abduction and obstruction of justice. Doc. 66; Doc 86, p. 34; *see also* Addendum to the PSR. In imposing a life sentence, Judge Polozola indicated that, even if it was later determined that those particular upward adjustments had not been properly applied, the court still would have departed upward to whatever level was necessary to impose a life sentence on Douglas. Doc. 86, p. 34. To that end, Judge Polozola found that criminal history category I did not adequately reflect the years of abuse Douglas had inflicted on Faulkner or his attempt to have his wife murdered while awaiting sentencing in this case. Doc. 86, p. 35.

Douglas appealed his conviction but not his sentence. The conviction was summarily affirmed by the Fifth Circuit on the day after oral arguments. *United States v. Douglas,* 162 F.3d 1160 (5th Cir. 1998) (per curiam); *see also* Doc. 86, p. 29.

---

[5] Under 18 U.S.C. § 2261(b), the maximum term of imprisonment varied from five years to life, depending on a number of factors. Here, because Douglas forced the victim to engage in a sexual act, the maximum statutorily prescribed term of imprisonment was life. *See* 18 U.S.C. §§ 2261(b)(4), 2241(a); *see also* PSR, p. 10, ¶ 51.

In November 1999, Douglas filed his first motion to vacate, pursuant to 28 U.S.C. § 2255, alleging that he was denied effective assistance of counsel at trial and sentencing. Doc. 80. He subsequently amended his motion to assert a claim under *Apprendi, infra*. Docs. 88, 89. In December 2000, Judge Polozola denied Douglas's motion. Docs. 95, 96. As relevant to the claims now repeated in the instant motion, the court found that (a) even if Douglas's counsel had objected to the court's application of Guidelines enhancements at sentencing, it would not have affected the sentence, which the court found was "clearly supported by the evidence in this case[;]" and (b) *Apprendi* does not apply retroactively. Doc. 95, pp. 6–8. Douglas sought a certificate of appealability ("COA") on the *Apprendi* issue; however, the Fifth Circuit denied the COA, because it was clear that "*Apprendi* announced 'a new rule of criminal procedure which is not retroactively applicable'" on collateral review. Doc. 106 (quoting *United States v. Brown*, 305 F.3d 304, 310 (5th Cir. 2002) (per curiam)). Douglas sought reconsideration and a COA, arguing that his life sentence should be vacated in light of *United States v. Booker*, 543 U.S. 220 (2005). Doc. 154. Both the district court and the Fifth Circuit denied a COA. Docs. 156, 164.

In June 2003, after being granted the requisite authorization to do so, Douglas filed a successive § 2255 motion and also requested a new trial. Doc. 109. Among other claims, Douglas contended that he had newly discovered evidence that the victim, Faulkner, had committed perjury at trial and that he was actually innocent. In March 2004, following a hearing on the issue of actual innocence, Douglas's successive motion was dismissed with prejudice. Docs. 135, 136. In March 2006, the Fifth Circuit denied a COA. Doc. 163.

Douglas subsequently sought, and was denied, authorization to file another successive § 2255 motion. Doc. 165. Among other claims, Douglas argued that the district court had erred

in imposing sentencing enhancements that were not alleged in the indictment or decided by a jury, in violation of *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

A little over a year later, in July 2016, Douglas filed yet another § 2255 motion, which was denied without prejudice as an unauthorized successive § 2255 motion. Docs. 169, 171. In seeking a COA, Douglas once again claimed that his sentence was improperly based on facts found by the district court, rather than facts found by a jury beyond a reasonable doubt. In October 2018, the Fifth Circuit denied a COA. Doc. 179.

In May 2020, Douglas filed his first motion for compassionate release, alleging that "his age (53), COVID-19, and his post-conviction rehabilitation" constituted "extraordinary and compelling" reasons to reduce his sentence; however, he acknowledged that he had not exhausted his administrative remedies. Doc. 180. This Court denied the motion on May 11, 2020, for failure to exhaust and no evidence of extraordinary and compelling reasons. Doc. 181. On the same day, Douglas filed a purported amendment with numerous supporting documents. Doc. 182.[6] On June 11, 2020, this Court again denied relief, finding in pertinent part that:

> Nothing in Douglas' *Amended Motion* changes the conclusions reached previously by the Court. Douglas provides documentation of his good behavior in prison and argues his opinion that he would not be a danger to the community. However, Douglas' violent and lengthy criminal history is well documented. Douglas' *Amended Motion* does not contain evidence of "extraordinary and compelling" reasons for his early release.

Doc. 185. Douglas appealed, and the Fifth Circuit dismissed the appeal as frivolous. Doc. 195.

---

[6] Incidentally, in support of the instant motion, Douglas has resubmitted many of the same documents, including medical records (*compare* Doc. 198-1, pp. 2–7 *with* Doc. 182, pp. 39–44); documents related to his performance in prison (*compare* Doc. 198-2, pp. 10–24 *with* Doc. 182, pp. 16, 24–37); inmate work history (*compare* Doc. 198-2, pp. 27–28 *with* Doc. 182, pp. 53–54); letters of support (*compare* Doc. 198-2, pp. 29–36 *with* Doc. 182, pp. 3–10); and a 1999 affidavit by his trial counsel detailing alleged inadequacies of his representation (*compare* Doc. 198-3, p. 2 *with* Doc. 182, p. 56). Douglas has also attached additional letters of support, updates regarding his performance in prison, and visitor's logs. *See* Doc. 198-2, pp. 2–4, 8–9, 25–26 and 37–39; and Doc. 198-3, pp. 3–6.

Douglas filed the instant motion on November 13, 2023, asking that the Court "modify his sentence and immediately release him to home confinement and a period of supervised release." Doc. 198, p. 1. At the outset of his motion, Douglas relies only upon the "unprecedented threat of COVID-19," to warrant his release. *Id.* Later, Douglas claims entitlement to compassionate release on the following bases: (1) his own personal health, given that he claims to suffer from "diseases which may worsen if not treated properly"; (2) the fact that he received an "unusually long sentence" and has already served more than 10 years; (3) the "incapacitation" of his "wife," Patricia Clayton, who purportedly requires a valve replacement; and (4) his "extraordinary rehabilitation" that "shows that he is ready for re-entry." *See* Doc. 198, pp. 11–15 and 26–31. In addition, Douglas argues that he should be resentenced on the following bases, which the United States submits are not cognizable in a motion for compassionate release: (1) despite his criminal history, "he should benefit from an adjustment intended to benefit offenders with no criminal history," apparently referencing Amendment 821 to the U.S. Sentencing Guidelines; and (2) his sentence was improperly increased based on an erroneous obstruction of justice enhancement. *See* Doc. 198, pp. 15–26.[7]

## II.    <u>Law Applicable to Compassionate Release Motions</u>

This Court generally does not have authority to amend a sentence after it has been imposed: "A judgment, including a sentence of imprisonment, 'may not be modified by a district court except in limited circumstances.'" *United States v. Moore*, 7-CR-60-SDD-EWD, 2021 WL 2325014 at *1 (M.D. La. 2021) (quoting *Dillon v. United States*, 560 U.S. 817, 825 (2010)).

---

[7] In support of his claim that he should have only been sentenced to five years, Douglas also reasserts his claim that *Apprendi* should retroactively apply and argues that he should have been subject to the lesser statutory penalty provided for in 18 U.S.C. § 2261(b)(5), based on the recent decision of the U.S. Supreme Court in *Concepcion v. United States*. For purposes of this response, the United States assumes that Douglas intended those arguments to support his claim that he received an "unusually long sentence" and addresses them accordingly.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), authorizes a sentencing court, on motion of the Bureau of Prisons ("BOP") or on motion of a defendant after exhausting administrative remedies, to reduce the defendant's term of imprisonment for "extraordinary and compelling reasons." It is the defendant's burden to demonstrate that relief is justified. *See United States v. Jackson*, 27 F.4th 1088, 1089 (5th Cir. 2022) (describing "three hurdles" a prisoner must overcome "to justify the reduction of his sentence," including the existence of extraordinary and compelling reasons); *United States v. Mathes*, No. 14-cr-69, 2020 WL 4014748, at *3 (M.D. La. July 16, 2020) (Dick, C. J.) ("Generally, the defendant has the burden to show circumstances meeting the test for compassionate release.").

The first of a defendant's three hurdles is to establish that "extraordinary and compelling reasons" justify the reduction of his sentence. *Jackson*, 27 F.4th at 1089 (quoting 18 U.S.C. § 3582(c)(1)(A)). The statute "does not authorize a district court to modify a sentence based on caprice or unbridled discretion." *United States v. Shkambi*, 993 F.3d 388, 390 (5th Cir. 2021).

Second, a defendant's requested reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." *Jackson*, 27 F.4th at 1089 (quoting 18 U.S.C. § 3582(c)(1)(A)). Effective November 1, 2023, the applicable policy statement, USSG § 1B1.13, was amended. Among other changes, the amendments to USSG § 1B1.13 expanded the medical and family circumstances which constitute extraordinary and compelling reasons and, generally, moved the list of extraordinary and compelling circumstances from the commentary to the text of the policy statement. In addition, as relevant to one of Douglas's arguments, USSG § 1B1.13(b)(6) provides that, in certain limited circumstances, if a defendant received an "unusually long sentence and has served at least 10 years" thereof, a change in the law may be considered in determining whether the defendant presents an extraordinary and compelling

reason for early release. Importantly, the policy statement also requires a determination that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(a)(2).

In order to overcome the third and final hurdle, a defendant "must persuade the district court that his early release would be consistent with the sentencing factors in 18 U.S.C. § 3553(a)." *Jackson*, 27 F.4th at 1089 (quoting 18 U.S.C. § 3582(c)(1)(A)). Thus, even when there are "extraordinary and compelling" reasons for a sentence reduction, "compassionate release is discretionary, not mandatory." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020) (affirming denial of compassionate release despite defendant's eligibility). In exercising its discretion, the district court is required to consider the sentencing factors set out in 18 U.S.C. § 3553(a) "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13; *see also Chambliss*, 948 F.3d at 693. As a result, an eligible defendant may be denied release to account for, among other things, his criminal history and the seriousness of his crimes. *See Chambliss*, 948 F.3d at 693–94.

## III.  Argument

### a.  Douglas has failed to exhaust administrative remedies as to certain claims.

Prior to enactment of the First Step Act in 2018, only the BOP was permitted to file a motion for compassionate release. Now, defendants are permitted to file such motions, but they must first exhaust BOP administrative remedies. The exhaustion requirement is satisfied if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or if 30 days have elapsed "from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *see also* 28 C.F.R. § 571.61(a) (providing that a prisoner's Section 3582(c)(1)(A) request for

compassionate release must be submitted to the warden of his facility). In other words, as the

Fifth Circuit has explained, "an inmate has two routes by which he may exhaust his

administrative remedies. Both begin with 'requesting that the [BOP] bring a motion on the

defendant's behalf.'" *United States v. Garrett*, 15 F.4th 335, 338 (5th Cir. 2021) (quoting *United

States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (quotation omitted)).

"As the BOP's program statements reflect, the exhaustion requirement allows the BOP to

have the first pass at the inmate's motion, to research the grounds for relief, and to bring the

motion on his behalf if it chooses." *United States v. Doyle*, Crim. No. 04-20127-03, 2021 WL

929878, at *2 (W.D. La. Mar. 10, 2021) (Cain, J.) (citing 28 C.F.R. § 571.62(a)). "This mirrors

the exhaustion requirement under the Prison Litigation Reform Act, which requires that an

inmate pursue administrative remedies through the BOP in order to give the prison an

opportunity to address the issue." *Id*. (citing *United States v. Williams*, 987 F.3d 700, 703–04

(7th Cir. 2021) (citing *Woodford v. Ngo*, 548 U.S. 81, 93 (2006))). Thus, a "district court may

deny a motion for compassionate relief as unexhausted where the defendant raises different

grounds from those he presented to the warden." *Id*.

Here, Douglas failed to take the initial required step by requesting that the BOP bring a

motion on his behalf via the appropriate form BP-9. In his motion, Douglas asserts that he has

exhausted his administrative remedies, because he filed a request with the warden at FCI

Edgefield; 30 days have since lapsed from the warden's receipt of that request; and the BOP has

failed to file a motion on Douglas's behalf. Doc. 198, p. 11. Attached to Douglas's motion is an

informal "Request to Staff," which is dated August 20, 2023, and appears to have been submitted

to the warden via TRULINCS.[8] Upon receiving notice of Douglas's motion, the United States

---

[8] In general, the Trust Fund Limited Inmate Computer System ("TRULINCS") application enables inmates to exchange electronic messages. https://www.bop.gov/inmates/communications.jsp (last visited November 30, 2023).

confirmed with BOP that the staff at FCI Edgefield did receive Douglas's informal request; however, for unknown reasons, the request was never processed. Although Douglas failed to file the appropriate form BP-9, under these circumstances, the United States will concede that Douglas's informal "request to staff" exhausted the claims raised therein, as discussed in more detail below.[9] *See United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020) (indicating that exhaustion is an argument-by-argument analysis); *see also Williams, supra,* 987 F.3d at 703–04.

In his informal "request to staff," Douglas asked that he be submitted "to the Compassionate Release / Reduction in Sentence Coordinator for consideration," for the following reasons: (1) he has served 27 years of a life sentence, which he claims would have only been a five-year sentence if it were imposed today; (2) he has engaged in rehabilitative programming and maintained "clear conduct" since arriving at FCI Edgefield; (3) he is 57 years old and experiencing deteriorating health "due to the natural aging process"; and (4) he claims that other, unspecified "collateral issues exist and can be addressed as necessary." Doc. 198-3, p. 7. In that same informal request, Douglas claims that his "home plan includes living with his fiancé, Patricia Clayton," and claims that he "will work at Curtis Ware Construction." *Id.*

The exhaustion requirement is mandatory. *United States v. Franco*, 973 F.3d 465 (5th Cir. 2020). And, a failure to exhaust cannot be cured by submitting an administrative request to the BOP *after* filing a compassionate release motion in court. *Garrett*, 15 F.4th at 340.

Although Douglas mentions Clayton in his informal request, he describes her only as his "fiancé," rather than his wife; makes no mention of any health conditions or "incapacitation" of Clayton; and does not mention, much less show, that he would be the only available caregiver for Clayton. Thus, Douglas has clearly failed to exhaust administrative remedies in connection with

---

[9] Because the request was not processed, the United States will give Douglas the benefit of the doubt and allow the date of the informal request to serve as the date it was received, for purposes of 18 U.S.C. § 3582(c)(1)(A).

any request for compassionate release based on family circumstances, under USSG § 1B1.13(b)(3), and his motion should be denied without prejudice as to that claim.[10] What remain are Douglas's other alleged bases for compassionate release, assuming that his informal request (and 30-day lapse) constituted exhaustion thereof.

**b.   Even assuming exhaustion, Douglas is not entitled to compassionate release.**

As noted above, Douglas states the following potentially cognizable grounds for compassionate release: his medical circumstances, his "unusually long sentence," and his rehabilitation. *See* Doc. 198, pp. 11–15 and 29–31. As to the latter, "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason[.]" USSG § 1B1.13(d). Rather, it "may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id*. For the reasons explained herein, Douglas has not carried his burden of showing extraordinary and compelling circumstances on any ground, whether considered alone or in combination with his rehabilitative efforts.

As it pertains to his own personal health, Douglas claims that he "must be granted compassionate release due to diseases which may worsen if not treated properly." Doc. 198, p. 13. Douglas claims that he "suffers from incurable, progressive diseases, from which [he] will never recover, to wit: Hypercholesterolemia and Chronic Viral Hepatitis C." *Id*. at p. 11. He further claims to suffer from "Esophageal Reflux, osteoarthritis, enlarged prostate wit lower urinary tract symptoms, eye, dental, and skin problems." *Id*. In support, Douglas attaches only a

---

[10] To the extent this Court disagrees, the United States respectfully submits that Douglas's claim should be denied on the merits, as Douglas has failed to establish, beyond his own conclusory allegations, that Clayton's alleged future "valve replacement" renders her incapacitated or that he is her "sole caregiver." Moreover, Douglas has made no showing that Clayton is his "spouse or registered partner" or "an individual whose relationship with the defendant is similar in kind to that of an immediate family member." *See* USSG § 1B1.13(b)(3)(B), (D).

few pages of BOP medical records, each entitled "Consultation Request," which all date back to

2016 and 2017 and primarily discuss osteoarthritis in Douglas's knees and the past and future

treatment plan pertaining thereto. *See* Doc. 198-1, pp. 2–7. The conditions he claims in the

instant motion are drawn from a section entitled "Health Problems," in which various conditions

are listed as Douglas's claimed health problems dating back to 2017. Importantly, these are the

same medical records which Douglas attached to his first amended motion for compassionate

release, which was denied by this Court in 2020. *Compare* Doc. 198-1, pp. 2–7 *with* Doc. 182,

pp. 39–44. Thus, Douglas has failed to present any new evidence of medical conditions which

might constitute extraordinary and compelling circumstances justifying his early release.

That said, as noted above, the applicable policy statement has been amended to expand

the medical circumstances provision since the Court denied Douglas's first motion. Even so, a

review of those expanded provisions clearly shows that Douglas's medical circumstances still do

not warrant a reduction. For instance, Douglas is not suffering from a terminal illness; he has not

alleged or established that any condition substantially diminishes his ability to provide self-care;

he does not require care that is not being provided; and he has not shown that FCI Edgefield is at

imminent risk of being effected by an ongoing outbreak of infectious disease or public health

emergency.[11] *See* USSG § 1B1.13(b)(1)(A)–(D). Douglas has failed to allege, much less carry his

burden of establishing, that his circumstances rise to the level of any of the potentially applicable

---

[11] Insofar as Douglas attempts to rely on the COVID-19 pandemic as grounds for compassionate release, his claims are unsupported by the current state of the nation or of his specific facility. *See In re: Rescission of CARES Act Authorization*, Administrative Order No. 2023-3 (M.D. La. April 25, 2023) (Dick, C.J.) (quoting H.J. Res. 7, which provides that "the national emergency declared by the finding of the President on March 13, 2020, in Proclamation 9994 . . . is hereby terminated."). As of December 4, 2023, FCI Edgefield reports one active case of COVID-19 and zero COVID-related deaths. *See* https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last visited December 5, 2023). Moreover, even during the height of the pandemic, this Court found that COVID-19 did not qualify as a reason for compassionate release. *See, e.g., United States v. Clark*, Crim. No. 17-85-SDD, 2020 WL 1557397 at *4 (M.D. La. Apr. 1, 2020) (Dick, C.J.) (rejecting the notion that "the *fear* of contracting a communicable disease warrants a sentence modification").

medical circumstances. Even in light of the expanded provisions, Douglas continues to "offer[]

no evidence of any medical conditions which render his health needs an extraordinary or

compelling reason for his immediate release," as found by this Court in May of 2020, based on

the exact same medical records now before the Court. Doc. 181, p. 4.

The amended policy statement also purports to recognize a new ground for a sentence

reduction in the case of a defendant who "received an unusually long sentence and has served at

least 10 years of the term of imprisonment[.]" *See* USSG § 1B1.13(b)(6). That subsection

provides that, "a change in the law (other than an amendment to the Guidelines Manual that has

not been made retroactive) may be considered in determining whether the defendant presents an

extraordinary and compelling reason" for a sentence reduction where "such change would

produce a gross disparity between the sentence being served and the sentence likely to be

imposed at the time the motion is filed, and after full consideration of the defendant's

individualized circumstances." *Id*. The section that follows, USSG § 1B1.13(c), sets limitations

on a court's consideration of any change in the law for purposes of the policy statement.

At the outset, the United States respectfully submits that § 3582(c)(1)(A)(i) does not

authorize sentence reductions based on non-retroactive changes in sentencing law, either alone or

in combination with other factors. As noted above, § 3582(c)(1)(A) provides an "except[ion]" to

the overarching principle of federal sentencing law that a "federal court generally 'may not

modify a term of imprisonment once it has been imposed.'" *Dillon*, 560 U.S. at 819 (quoting 18

U.S.C. § 3582(c)). Congress plainly instructed that any reason sufficient to overcome that

general principle must be "extraordinary and compelling." 18 U.S.C. § 3582(c)(1)(A)(i).  No

reasonable interpretation of that phrase's text, particularly when considered in light of the

statute's structure and purpose, can encompass nonretroactive or intervening changes in law.

"[A] prisoner may not leverage non-retroactive changes in criminal law to support a compassionate release motion, because such changes are neither extraordinary nor compelling."[12] To the contrary, "in federal sentencing the *ordinary* practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280 (2012) (emphasis added). "[T]he Commission does not have the authority to amend the statute" or "to override the statute as [the court of appeals] has construed it." *Neal v. United States*, 516 U.S. 284, 290, 294 (1996). The Commission's interpretation of the statute as set forth in subsection (b)(6) is unreasonable and therefore invalid. *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 58 (2011); *United States v. LaBonte*, 520 U.S. 751, 753 (1997) (invalidating Guidelines amendment where "the Commission's interpretation is inconsistent with [the statute's] plain language"). Yet, even if it were valid, Douglas could not establish that the sentence he received is unusually long or grossly disparate to the sentence he might receive today. And in any event, the § 3553(a) factors independently preclude relief.

In his motion, Douglas supports his claim that he qualifies for this new provision by stating only that he has "already served his sentence for at least 10 years and this presents as an 'extraordinary and compelling reasons.'" Doc. 198, p. 15. Douglas makes no effort in the instant motion to establish that the sentence he received is unusually long or grossly disparate to the sentence he might receive today. That said, construing his motion liberally and reading it in the context of his informal request to staff at FCI Edgefield, the United States will assume for purposes of this response that Douglas is relying on his *Apprendi*- and *Concepcion*-based

---

[12] *United States v. McMaryion*, No. 21-50450, 2023 WL 4118015, at *2 (5th Cir. 2023) (unpublished) (per curiam) (citing *United States v. Jenkins*, 50 F.4th 1185, 1198-1200 (D.C. Cir. 2022) and *United States v. McCall*, 56 F.4th 1048, 1050 (6th Cir. 2022) (en banc)).

arguments in connection with this claim, namely to allege that there has been a change in the law and that this Court should consider that change in determining whether extraordinary and compelling reasons warrant a reduction in sentence. *See* Doc. 198-3, p. 7.

As this Court is well aware, in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Since his initial § 2255 motion, Douglas has repeatedly claimed that, in light of *Apprendi*, he should have only been subject to the five-year penalty provided by § 2261(b)(5), because the jury was not asked to determine whether defendant forced the victim to engage in sexual acts, which was the basis for the increased statutory penalty of life imprisonment, under § 2261(b)(4) and § 2241(a). *See* PSR, p. 4, ¶ 7; p. 5, ¶ 17; and p. 10, ¶ 51.

To the extent Douglas relies upon *Apprendi* as the "change in law" supporting his argument, the United States first notes that his claim was previously denied by the sentencing court on the merits on collateral review, Doc. 95, and dismissed by the Fifth Circuit, Doc. 106. As explained above, the Fifth Circuit denied Douglas a COA, because it was clear that "*Apprendi* announced 'a new rule of criminal procedure which is not retroactively applicable[.]'" Doc. 106 (quoting *Brown*, 305 F.3d at 310). Douglas concedes that *Apprendi* is not retroactively applicable, *see, e.g.,* Doc. 198, p. 19, but insists that this Court should nonetheless apply it retroactively to reduce his sentence or find that it constitutes a "change in law," which is both extraordinary and compelling and thus warrants a reduction. But, as the Fifth Circuit has specifically acknowledged, "*Apprendi* did not create a substantive change in the law." *Brown*, 305 F.3d at 309 (collecting cases from other circuits acknowledging same). And, "a prisoner may

not leverage non-retroactive changes in criminal law to support a compassionate release motion, because such changes are neither extraordinary nor compelling." *McMaryion*, *supra*.

When a change in the law is not retroactively applicable to a sentence that is already final, nothing is "extraordinary" about that final sentence reflecting prevailing law at the time when it was imposed. Consistent with the "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute,'" *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018), the word "extraordinary" should be understood "to mean 'most unusual,' 'far from common,' and 'having little or no precedent,'" *United States v. McCall*, 56 F.4th 1048, 1055 (6th Cir. 2022) (en banc) (quoting Webster's Third New International Dictionary of the English Language 807 (1971) (Webster's)); *see also United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("understand[ing] 'extraordinary' to mean 'beyond or out of the common order,' 'remarkable,' and synonymous with 'singular.'") (citations omitted). Far from being unusual, uncommon, or unprecedented, a defendant's lawfully imposed sentence simply reflects the law at the time he was sentenced. And any potential disparity between his sentence and the sentence he might receive today merely reflects the operation of ordinary nonretroactivity principles.

A nonretroactive change in sentencing law likewise cannot constitute a "compelling" reason for a sentence reduction. When Congress enacted the Sentencing Reform Act of 1984, "[c]ompelling" meant (and still means) "forcing, impelling, driving." *McCall*, 56 F.4th at 1055; *see also Escajeda*, 58 F.4th at 186 ("Compelling" is a participle of "compel," which means "to drive or urge with force, or irresistibly," "to force," and "to subjugate.") (citations omitted). Thus, for a reason to be "compelling" under § 3582(c)(1)(A)(i), it must provide a "forcing, impelling, [or] driving" reason to disturb the finality of a federal sentence. *McCall*, 56 F.4th at

19

1055 (internal quotation marks omitted); *Escajeda*, 58 F.4th at 186 ("These terms explain why prisoners can seek relief under § 3582(c)(1) only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner.") (citing *Chambliss*, 948 F.3d at 693). Ordinary principles of nonretroactivity, however, already consider, and reject, the notion that all changes in the law should be allowed to disturb final convictions and sentences. The very point of the doctrine is to identify the small subclass of changes in the law that should be applied retroactively. To treat a nonretroactive change in the law as a "compelling" reason to disturb a final sentence would thus undo the balance already struck by ordinary nonretroactivity principles. Nothing about a nonretroactive change in the law forces, impels, or drives such a nonsensical outcome.

Accordingly, a nonretroactive change in the law cannot serve as either an "extraordinary" or a "compelling" reason for a sentence reduction in isolation or as adding to a package of such "reasons." 18 U.S.C. § 3582(c)(1)(A)(i).  Whether considered alone or in combination with other asserted factors, a nonretroactive change in sentencing law is a "legally impermissible" consideration for purposes of determining whether an extraordinary and compelling reason exists. *Jenkins*, 50 F.4th at 1202 (internal quotation marks omitted).

Finally, to the extent Douglas suggests that a conclusion that changes in law cannot provide extraordinary and compelling reasons for a sentence reduction would conflict with the Supreme Court's decision in *Concepcion v. United States*, 597 U.S. 481 (2022), that suggestion is misplaced, and several circuits have previously rejected it.[13] In *Concepcion*, the Supreme Court considered the scope of a district court's discretion under Section 404 of the First Step Act

---

[13] *See, e.g., United States v. Rodriguez-Mendez*, 65 F.4th 1000, 1003-04 (8th Cir. 2023); *Jenkins, supra,* 50 F.4th at 1200; *United States v. Bledsoe*, No. 22-2022, 2022 WL 3536493, at *2 (3d Cir. Aug. 18, 2022); *McCall, supra,* 56 F.4th 1048, 1061-62; and *United States v. King*, 40 F.4th 594, 595-96 (7th Cir. 2022).

("FSA"), which expressly provides for a court to revisit the sentence of a defendant convicted of a crack-cocaine offense "the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010." § 404(a), 132 Stat. 5222; § 404(b), 132 Stat. 5222; *Concepcion*, 597 U.S. at 488–89. The Court explained that, in adjudicating a motion under Section 404 of the FSA, a district court "may consider other intervening changes" of law or fact, beyond the changes made by those sections of the Fair Sentencing Act. *Concepcion*, 597 U.S. at 486.

Unlike Section 404 of the FSA, which directly authorizes sentence reductions for a specifically defined subset of previously sentenced drug offenders, § 3582(c)(1)(A)(i) contains a threshold requirement that a district court identify "extraordinary and compelling reasons" warranting a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). Indeed, the Court in *Concepcion* identified § 3582(c)(1)(A) as a statute in which "Congress expressly cabined district courts' discretion" in a way that Section 404 does not. 597 U.S. at 494–95. Douglas's reliance on *Concepcion* is therefore misplaced.

Moreover, even if Douglas could show extraordinary and compelling reasons, it would still be his burden to "persuade the district court that his early release would be consistent with the sentencing factors in 18 U.S.C. § 3553(a)." *Jackson*, 27 F.4th at 1089 (quoting 18 U.S.C. § 3582(c)(1)(A)). After considering those factors, an eligible defendant may be denied release to account for, among other things, his criminal history and the seriousness of his crimes. *See Chambliss*, 948 F.3d at 693–94.

As was the case at the time of his first motion for compassionate release and amendment thereto, consideration of the applicable § 3553(a) factors independently precludes relief. Just as before, if Douglas's exhibits are believed, he has been a model prisoner. But his good behavior in prison does not outweigh the years of violent and cruel conduct that landed him in prison in

the first place. Douglas was given a life sentence because of his history of violence against his wife, the seriousness of the rape of which he was convicted, and the post-trial effort to murder his wife. Those factors have not changed, and a reduced sentence would not reflect the seriousness of the offense, promote respect for the law, provide just punishment, or deter others from committing similar crimes. *See* 18 U.S.C. § 3553(a)(2)(A) & (B). As previously recognized by this Court, "Douglas' violent and lengthy criminal history is well documented." Doc. 185.

Notably, it continues to be true that Douglas does not exhibit any true remorse in the instant motion, just as he failed to do in his earlier filings.[14] To the contrary, Douglas remains intent on disputing his guilt and discrediting the victim—in other words, re-casting himself as the true victim against whom the government "used their power to alter the outcome of his sentence and Faulkner," who he maintains committed perjury in testifying against him.[15] Doc. 198, pp. 25–26. As was the case with his prior filings, Douglas again attaches a 1999 affidavit from his trial counsel, the only conceivable reason for which is to suggest that his conviction was wrongful.[16] *Compare* Doc. 182 at p. 55 *with* Doc. 198-3, p. 2. But, to make that suggestion is to undermine his claim of rehabilitation, which "demands that the convicted defendant realize that 'he is justly subject to sanction.'" *Engle v. Isaac*, 456 U.S. 107, 127 n.32 (1982) (citation omitted). Douglas apparently refuses to acknowledge that he was justly convicted; therefore, his assertion of rehabilitation continues to ring hollow.

---

[14] This is true despite Douglas's vague and passing claim that he "has had many years to reflect on his past mistakes and is remorseful for his past actions." *See* Doc. 198, p. 30; *but see id.* at p. 25–26 (reasserting his claims that Faulkner perjured herself and claiming that it was the Government, and not Douglas, who obstructed justice in this case by using its "power to alter the outcome of his sentence and Faulkner[.]").
[15] The United States remains firmly convinced of Faulkner's truthfulness at trial. *See* Doc. 116, p. 6.
[16] The affidavit was attached to Douglas's original § 2255 motion, which was filed in 1999. *See* Doc. 80, p. 81. His ineffectiveness of counsel claims based on the affidavit were rejected by Judge Polozola, who presided over the trial, in part because of the "overwhelming evidence of guilt." *See* Doc. 95.

Finally, Douglas is not eligible for a sentence reduction because he has not demonstrated that he "is not a danger to the safety of any other person or the community." *See* USSG § 1B1.13(a)(2). Admittedly, Douglas has presented some evidence that he has behaved well in prison. But, considering the nature of Douglas's past violence, his behavior in prison is of little value in predicting his dangerousness if released. Douglas is a domestic abuser—a bully who preyed upon an intimate partner who was weaker than him by nature and therefore defenseless against his abuse. It is fair to assume that the correctional officers and other male prisoners at FCI Edgefield are not so defenseless. So, it is no more surprising now than it was at the time of his original motion for compassionate release that Douglas has not been violent against his fellow inmates and correctional officers. Douglas's prison record is simply not an accurate barometer of his brand of dangerousness. There is no reason to doubt that Douglas would easily fall back into his prior pattern of abuse once he is free and finds a vulnerable woman to bully and threaten and beat. And, given Douglas's continued lack of true remorse, there is every reason to believe that he remains motivated to kill or harm Faulkner—in retaliation for her testimony against him, if nothing else. In the end, Douglas has provided no basis for this Court to find that he would not pose a danger if released.

**c.  This Court should not order Douglas to be transferred to home confinement.**

As noted above, Douglas makes a passing request that he be transferred to home confinement. Doc. 198, p. 1. To the extent this Court is inclined to even consider that request, it should be summarily denied. BOP chooses where Douglas is held. The BOP has its own authority, independent of federal courts, to allow certain offenders to serve some of their time in home confinement rather than in prison. *See* 18 U.S.C. §§ 3621(b), 3624(c); *United States v. Voda*, 994 F.2d 149, 151–152 (5th Cir. 1993); *United States v. Sneed*, 63 F.3d 381, 389, n. 6 (5th

Cir. 1995). Assigning a prisoner to home confinement is a transfer within federal custody. Such transfers lie within the discretion of BOP and this Court has no statutory authority to designate a prisoner's place of incarceration. *See, e.g., United States v. Tran*, 15-CR-170-BAJ-RLB, 2022 WL 17640195 at *6, n. 3 (M.D. La. 2022).

### d.  Douglas is not eligible for relief under Amendment 821.

To the extent Douglas argues that he should benefit from the retroactive parts of Amendment 821, Douglas's argument would be cognizable under 18 U.S.C. § 3582(c)(2), rather than § 3582(c)(1)(A); however, because Douglas is not eligible for relief, his argument lacks merit and should be denied.[17] In pertinent part, Amendment 821 alters the application of the Guidelines with respect to certain offenders who (a) earned criminal history "status points" based on commission of an offense while serving a criminal justice sentence (*see* USSG § 4A1.1); or (b) presented zero criminal history points at the time of sentencing (*see* USSG § 4C1.1). As to the former, Douglas did not receive any "status points;" therefore, the Amendment would not afford Douglas any relief. As to the latter, Douglas is ineligible for failure to meet the requisite criteria for eligibility under USSG § 4C1.1(a), including at least the following criteria (as numbered in the amended Guideline): (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; and (10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role). Thus, Douglas's claim that "he should benefit from an adjustment intended to benefit offenders with no criminal history" is meritless.[18]

---

[17] "[C]hanges to the Sentencing Guidelines can give rise to relief under 18 U.S.C. § 3582(c)(2), not § 3582(c)(1). *McMaryion*, 2023 WL 4118015, at *2 (citing *United States v. Lyons*, 25 F.4th 342, 344–46 (5th Cir. 2022)).

[18] In any event, any consideration of the applicability of Amendment 821 would still be subject to and limited by the Court's consideration of the applicable § 3553(a) factors and the nature and seriousness of any danger posed by the

**e. Douglas's remaining claims are not cognizable.**

Certain claims—even if they might otherwise be deemed extraordinary and compelling—are not cognizable under the compassionate release statute because of the "habeas-channeling rule." *Escajeda*, 58 F.4th at 186–87. Chapter 153 of Title 28, including Section 2255, provides avenues for post-conviction relief from illegal convictions and sentences. *Id*. at 186. Where Chapter 153 provides an available mechanism for relief, prisoners are prohibited by the "habeas-channeling rule" from seeking relief via a compassionate release motion. *Id*. at 186–87. Thus, "substantive challenges to the legality" of a prisoner's confinement "are not cognizable" under the compassionate release statute. *McMaryion*, 2023 WL 4118015, at *1. To the extent Douglas claims that his sentence was wrongly determined or somehow exceeded the penalty provided by statute, his claims are "quintessential" challenges to the legality of his sentence and are not cognizable on a compassionate release motion. *See Escajeda*, 58 F.4th at 187.

## IV. <u>Conclusion</u>

For the above reasons, Douglas's motion for compassionate release should be denied.

UNITED STATES OF AMERICA, by

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY

<u>/s/ Caroline B. Gardner</u>
Caroline B. Gardner, LBN 33842
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana  70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: caroline.gardner@usdoj.gov

---

defendant if his sentence were to be reduced. See USSG § 1B1.10 cmt. n.1(B). As such, even if Douglas could show eligibility, he would still not be entitled to relief for the reasons previously stated herein.

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA   :
                           :
   *versus*                    :     CRIMINAL NO. 97-5-SDD
                           :
BILLY DOUGLAS              :


## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that a true and correct copy of the foregoing *United States' Response in Opposition to Defendant's Motion for Compassionate Release* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the court's electronic filing system and to Pro Se Defendant via U.S. Mail at:

      Billy Douglas
      18753-001
      Federal Correctional Institution
      P.O. Box 725
      Edgefield, SC 29824

Baton Rouge, Louisiana this 5th day of December, 2023.

                          /s/ Caroline B. Gardner
                          Caroline B. Gardner, LBN 33842
                          Assistant United States Attorney